UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ERIC ABAKPORO,

              Plaintiff,

          - against -

SAHARA REPORTERS, OMOYELE
SOWORE, and OMOYELE SOWORE
d/b/a SAHARAREPORTERS.COM,

              Defendants.
----------------------------------------------------------------x

**MEMORANDUM & ORDER**

10 CV 3256 (RJD) (VVP)

DEARIE, District Judge.

       Plaintiff Eric Abakporo, proceeding <u>pro se</u>, bases claims under New York law for libel, invasion of privacy and intentional and negligent infliction of emotional distress on a pair of news articles published in 2010 by defendant Omoyele Sowore via journalism outfit Sahara Reporters (collectively, "defendant").  The articles report on a petition (the "Petition") by a group of Nigerian citizens, calling itself the Patriots and leveling allegations of corruption within the official ranks of the Permanent Mission of Nigeria to the United Nations (the "Nigerian Mission").  The first of the articles summarizes the Petition's contents, some of which refer to plaintiff, and cites to an unrelated 2008 New York Daily News report linking plaintiff to a real estate scam in Harlem.  The second article describes the Nigerian Mission's reaction to the first article and includes a photo of plaintiff that was published alongside the 2008 Daily News story.

       Defendant moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  As explained below, defendant's motion is granted with respect to all but plaintiff's claim for libel, as it relates to statements that may plausibly be read to connect plaintiff to alleged fraud occurring within the Nigerian Mission.

**Background**

In evaluating defendant's motion, the Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit, or any statements or documents incorporated in it by reference." Id. at 152 (internal quotation marks omitted). In this case, such documents include the Petition and the allegedly defamatory news articles. At the Rule 12(b)(6) stage, moreover, the Court may take judicial notice of prior state court proceedings. See, e.g., Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotels & Resorts, 369 F.3d 212, 217 (2d Cir. 2004).

The parties

Plaintiff Eric Abakporo, a native of Nigeria, is a real estate lawyer with an office in Brooklyn and a part-time pastor of the Pentecostal Deeper Life Bible Church in Jamaica, Queens. By his own admission, plaintiff "offer[s] free legal services to the Nigerian community" and "volunteers to provide legal service and guidance to the Nigerian mission." (Pl. Aff., dkt. #14, ¶¶ 10, 19.)

Defendant Omoyele Sowore is a Nigerian-born journalist who was granted political asylum in the United States for his opposition to military rule in Nigeria. Currently residing in New Jersey, defendant operates a New-Jersey-based online news site, Sahara Reporters, accessible at www.saharareporters.com. Sahara Reporters publishes original articles and commentary regarding current events around the world, with an emphasis on happenings in and affecting Nigeria, including reports of corruption by Nigerian officials.

<u>The Daily News article</u>

Although plaintiff's claims narrowly concern a pair of online postings in 2010 by Sahara Reporters, the chronicle begins with an article published in the New York Daily News on March 30, 2008 (the "Daily News article"), entitled "'Pals scam 78-year-old Harlem woman out of $15M fortune." (Balin Decl., dkt. #12-5, Ex. G.) The Daily News article describes how plaintiff and "his partner in real estate," Ms. Latanya Pierce, garnered a block-long parcel of real estate on St. Nicholas Avenue in Harlem from an elderly widow, Ms. Ina MacArthur, for well below market value. According to the article, after learning that MacArthur intended to sell the property, plaintiff befriended her and helped her with her chores and medical needs. Plaintiff and Pierce soon consummated the below-market sale through "a series of complex transactions" in which plaintiff's corporation agreed to purchase the property from MacArthur before assigning the contract to an entity co-owned by Pierce and plaintiff's wife. (<u>Id.</u> at 2.)

At the time of the article's publication, MacArthur had received only $20,000 of the proposed $3.1 million in net proceeds. Although she expected the remainder to be paid in cash at the closing, MacArthur accepted an eleventh-hour, unrecorded purchase-money mortgage for the difference. Plaintiff, as quoted in the Daily News article, termed the transaction a "loan."[1] (<u>Id.</u> at 7.) A $500,000 certified check furnished by Pierce at the closing, but never transferred or deposited, reportedly was a forgery. In a brief follow-up article, the Daily News reported that the Manhattan District Attorney was investigating the matter. No criminal charges were filed.

---

[1] MacArthur filed suit to reclaim the unpaid proceeds. In July 2010, with the lawsuit pending, the entity that owns the property (Creekhill Properties LLC) commenced a Chapter 11 bankruptcy proceeding in the Eastern District of New York. <u>See</u> 10 BK 46240 (JF). Represented by plaintiff, Creekhill listed Ms. MacArthur as holding a "disputed" $2 million unsecured claim. In May 2011, upon motion by MacArthur, the Bankruptcy Court dismissed the petition with prejudice and barred Creekhill from filing a bankruptcy petition for two years.

<u>The Daily News action</u>

Plaintiff promptly sued the Daily News for invasion of privacy and libel (the "Daily News action").  By opinion dated November 18, 2008, pinning the complaint on the spectrum "somewhere between a narrative defense of plaintiff's actions and an angry rant," the New York Supreme Court (Justice Martin M. Solomon) dismissed the case.  (Balin Decl., Ex. H, at 2.) Justice Solomon noted that the Daily News article "contains few references to the plaintiff and none that could be considered clearly defamatory," and he concluded "that the bulk of th[e] article, at least to the extent that it is unflattering, are various opinions of quoted individuals or the authors."  (<u>Id.</u>)  Furthermore, because "the statements regarding plaintiff in the story are essentially true or non-actionable opinions," plaintiff had no right to recovery "even if in totality the article paints plaintiff in an unfavorable false light."  (<u>Id.</u> at 4.)  Plaintiff did not appeal.

<u>The Petition</u>

The articles at issue by Sahara Reporters focus largely on the Petition, dated March 18, 2010, addressed to Acting President Goodluck Jonathan and undersigned by Gamadika Liposam on behalf of a Nigerian citizen group labeling itself the "Patriots."[2]  (<u>See</u> Balin Decl., Ex. B, at 5.)  Employing a healthy dose of vitriol, the Petition accuses the Nigerian Ambassador to the United Nations, Joy Ogwu, of overseeing the misappropriation of public funds via the routine and often secretive approval of unauthorized expenditures relating to the Nigerian Mission.  The Petition's authors request that the Nigerian authorities assign a "team of unbiased investigators" to research their claims "as a matter of absolute urgency."  (<u>Id.</u> at 4.)

By way of example, the Petition lists several contracts for renovation of the Nigeria House that its authors allege are inflated or were awarded in a procedurally improper fashion.

---

[2] As its return address, the Petition lists the Ministry of Foreign Affairs on Maputo Street in Nigeria.  (Balin Decl., Ex. B, at 1.)

Two of these contracts concern renovation of the Nigeria House's interior.  The Petition asserts

that a recently repaired two-bedroom apartment was awarded "another refurbishing contract" in

the amount of $386,907.53, and that "a few cubicles" used for office work "were renovated" at a

cost of $288,797.97.  (Id. at 3.)  Attached to the Petition is a copy of a ledger reflecting payments

in these amounts, made during mid-December 2009, to "St. Cyprian Properties Inc."  (Id. Ex. 5.)

A number of exhibits connect plaintiff to St. Cyprian Properties, which the Petition labels

Ambassador "Ogwu's front for fraud."  (Id. at 3.)  Of note, the Petition cites to a "renovation

contract in the Mission costing US$203,156.59 awarded to Corporate Design Collaborative Inc.

["CDCI"] through . . . St. Cyprian Properties."  (Id.)  Attached is an undated letter from CDCI to

the Nigerian Mission:  "We were not able to send this letter to Eric Abakporo because he has not

provided to us an address for his company; St. Cyprian Properties, Inc., and his email box . . . is

full and will not accept emails."  (Id. Ex. 6.)  Also attached is a March 11, 2010, letter from

CDCI threatening to stop work unless paid in full, and stating that the company would "only

continue work on this project in accordance with the signed contract and the verbal instructions

given to us by Eric Abakporo."  (Id. Ex. 7.)  A copy of the second letter is addressed to "Eric

Abakporo St. Cyprian Properties, Inc."  (Id.)

The Petition is copied to the Chairman of Nigeria's Economic and Financial Crimes

Commission ("EFCC").[3]  The duties of the EFCC include "the examination and investigation of

all reported cases of economic and financial crimes."  EFCC Establishment Act (2004), § 6(h).

---

[3] In support of the motion to dismiss, defendant submits the respective Commissions' enabling
statutes and the current contents of their publicly available websites.  The Court considers these
materials below for the limited purpose of rejecting defendant's argument that the Petition
comprises an "official proceeding" within the meaning of New York's statutory fair reporting
privilege.  See NewMarkets Partners LLC v. Oppenheim, 638 F. Supp. 2d 394, 404 (S.D.N.Y.
2009) ("Under Federal Rule of Civil Procedure 44.1, this Court may make determinations
regarding foreign law by considering 'any relevant material or source, including testimony,
whether or not submitted by a party or admissible under the Federal Rules of Evidence.'").

The EFCC "has power to cause investigations to be conducted as to whether any person . . . has committed any [such] offence."  Id. § 7(1)(a).  According to its website, "[t]he most common way of accepting cases by EFCC is through a petition written by an individual or organization." (Balin Decl., Ex. C, at 2.)  The EFCC's web site continues:  "The petition will be evaluated and if the case falls within the purview of the commission's mandate, it will be accepted for investigation and possibly prosecution."  (Id.)

The Petition also is copied to the Chairman of Nigeria's Independent Corrupt Practices and Other Related Offences Commission ("ICPC").  The ICPC was created in part "to receive and investigate any report of" the intended, attempted, or actual commission of "an offense under [the] law[s] prohibiting corruption."  ICPC Act (2000), § 6(a).  Reports to the ICPC "may be made orally or in writing to an officer of the Commission."  Id. § 27(1).  The ICPC will investigate those reports that provide "reasons to suspect the commission of an offence."  Id. § 27(3).

<u>The March 30, 2010, Sahara Reporters article</u>

On March 30, 2010, defendant published an article reporting on the Petition (the "March 30 article"), entitled "Ambassador Ogwu superintends plunder of Nigeria House in New York, group alleges."[4]  (Dkt. #16, at 2.)  The March 30 article summarizes and in certain places quotes the Petition's allegations.  The article misquotes the Petition as stating that St. Cyprian Properties is "'Amb[assador] Ogwu's choice front,'" rather than her "front for fraud," and reports that St. Cyprian

> rings a bell in New York because it belongs to Eric Abakporo, who the
> New York Daily News reported as being part of a terrible scam in 2008.
> Exactly two years ago today, on March 30, 2008, the paper reported that
> Mr. Abakporo was part of a two-person team that had taken a 78-year

---

[4] Each of the March 30 and April 22 articles was "Written by Saharareporters, New York."

old Harlem widow on a roundabout journey over her property, worth up
to $15 million, but in which she had received only $20,000.

(Id. at 3.)

The March 30 article continues:

> In one of the documents sent with the petition, Mr. Edgard Caicedo, a
> principal of [CDCI], which got the renovation contract, indicated it could
> not find Mr. Abakporo, who in his spare time is a pastor of the Deeper
> Life Bible Church, to pass a letter to.  This is despite the fact that the
> Nigerian Mission was continuing to do business with Mr. Abakporo's St.
> Cyprian Properties.  Two of the transactions show that in one week in
> December 2009, St. Cyprian properties got two cheques worth
> $288,797.97 and $386,907.53.  SR repeatedly called Mr. Abakporo's law
> firm in Brooklyn, the calls were not answered and the messaging system
> could not record voice mails.[5]

(Id.)

<u>The April 22, 2010, Sahara Reporters article</u>

Some at the Nigerian Mission reportedly did not take kindly to the March 30 article and
relayed this reaction to defendant.  On April 22, 2010, defendant published a follow-up article
(the "April 22 article"), entitled "Nigerian Ambassador to the UN, Joy Ogwu, to commence
multi-million dollar lawsuit against SaharaReporters."  (Dkt. #16, at 5.)  Below the headline
appears the photo of plaintiff published alongside the Daily News article in 2008.

The April 22 article states that "after SaharaReporters published a story based upon a
petition written by workers of the Nigerian mission, Ambassador Ogwu sent a lawyer, Eric
Abakporo, . . . to speak with us."  (Id.)  The article continues:  "Mr. Abakporo, who is referred to
as a 'relative' of Prof. Ogwu, was one of the beneficiaries of the suspicious contracts in which
thousands of dollars are involved."  (Id.)  During the meeting, plaintiff told the article's author

---

[5] The Court refers to these paragraphs, respectively, as the "MacArthur statements" and the
"St. Cyprian statements."

that unnamed "'Nigerian officials'" had instructed him "many times to sue and shut down SaharaReporters," but that "he had not thought it wise to do so." (<u>Id.</u> at 6.)

The present lawsuit

By complaint dated April 22, 2010 – the date on which the latter article was published – plaintiff commenced this action in New York Supreme Court, Kings County.  The complaint recites the allegedly offending language published by SaharaReporters and offers two primary reasons why the articles are defamatory.  First, plaintiff alleges that the MacArthur statements in the March 30 article and the use of his photo in the April 22 article "republish[ed] the Daily News [article] of March 30, 2008 in all its ramifications." (Compl. ¶ 10.)  Second, he contends that the St. Cyprian statements falsely assert or imply that he "owns St. Cyprian Properties" and that he "had been involved in a fraudulent scheme with others to defraud [the] Nigerian Mission in New York." (<u>Id.</u> ¶ 7.)  Plaintiff argues that he "depends upon his good reputation to make a living" and that the articles tend to hinder his professional activities as a solo legal practitioner and as a pastor. (Id. ¶¶ 8, 12.)  Plaintiff also asserts claims for invasion of privacy, (<u>id.</u> ¶ 17), and for intentional and negligent infliction of emotional distress, (<u>id.</u> ¶ 31).  He seeks an undifferentiated $30 million in damages.

On July 16, 2010, defendant removed the action to federal court on the basis of diversity jurisdiction.  <u>See</u> 28 U.S.C. §§ 1332(a)(1), 1441.  Defendant now moves to dismiss the action pursuant to Federal Rule Civil Procedure 12(b)(6) for failure to sate a claim.  On August 6, 2010, defendant filed a letter outlining the anticipated bases of the motion to dismiss and requesting a pre-motion conference.[6]  One asserted basis, discussed below, is that the final order of dismissal in the Daily News action bars a second action for libel based on that article's contents.  Weeks

---

[6] The Court's attempts to contact plaintiff via telephone in August and September 2010 to schedule the conference were unsuccessful.

after receiving the letter, plaintiff requested permission from the New York Supreme Court to replead his complaint in the Daily News action.  (See Hendrickson Decl., dkt #13-2, Ex. B.)  The Supreme Court denied the motion.  (Id. Ex. C.)  Plaintiff's appeal to the Second Department is pending.  (Pl. Aff., Ex. B.)

## Discussion

"Under familiar principles, New York law is to be applied in this (removed) diversity case, subject to applicable first amendment requirements."[7]  Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc, 844 F.2d 955, 959 (2d Cir. 1988).  With the appropriate state-law elements and constitutional principles in mind, "'[d]etermining whether [the] complaint states a plausible claim for relief will [nevertheless] be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Ruston v. Town Bd., 610 F.3d 55, 58 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009)).  Despite plaintiff's unrepresented status, he is a practicing "lawyer and, therefore, he cannot claim the special consideration which the courts customarily grant to pro se parties."  Harbulak v. Suffolk County, 654 F.2d 194, 198 (2d Cir. 1981) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972)).

### The privacy claims

Plaintiff asserts a hodgepodge of privacy-based claims.  Among these are claims that the Sahara Reporters articles "publiciz[ed] plaintiff's private affairs for which the public has no legitimate concern," (Compl. ¶ 20), "culminated in a wrongful intrusion into [his] private activities," (id.), and "unreasonably placed [him] in disrepute in the public eye," (id. ¶ 16).  These conclusions, whatever their merit, do not state a cause of action, because "New York does not recognize a common law right of privacy."  Messenger v. Gruner + Jahr Printing &

---

[7] "The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law."  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted).

Publishing, 208 F.3d 122, 125 (2d Cir. 2000); see Howell v. N.Y. Post Co., 81 N.Y.2d 115, 123

(1993) (reaffirming that, although these "torts have been recognized elsewhere," New York does

not honor claims of "unreasonable publicity given to another's private life, unreasonable

intrusion upon seclusion, and publicity that unreasonably places another in a false light"

(citations omitted)).

     New York does recognize a right to publicity, which "is governed exclusively by sections

50 and 51 of the Civil Rights Law." Howell, 81 N.Y.2d at 123. Section 51 creates a cause of

action for money damages by any living "person whose name, portrait, picture or voice is used

within this state for advertising purposes or for the purposes of trade without . . . written

consent."[8] N.Y. Civ. Rights Law § 51. New York has "made clear that these sections do not

apply to reports of newsworthy events or matters of public interest," because such articles are

"not deemed produced for the purposes of advertising or trade." Gruner + Jahr, 208 F.3d at 126.

Additionally, courts have "held that 'newsworthiness' is to be broadly construed." Id. at 126-27

("[W]here a plaintiff's picture is used to illustrate an article on a matter of public interest, there

can be no liability under sections 50 and 51 unless the picture has no real relationship to the

article or the article is an advertisement in disguise.")

     Plaintiff does not assert a claim pursuant to Section 51. Rather, he contends that the use

of his photo by Sahara Reporters "republish[ed] the Daily News publication of March 30, 2008."

(Compl. ¶ 10.) That argument is dispatched below. A Section 51 claim based on the photo

would equally fail, as the allegations introduced in the Petition and by Sahara Reporters regard

matters of obvious public import. See, e.g., Rookard v. Health and Hospitals Corp., 710 F.2d 41,

46 (2d Cir. 1983) ("An allegation of corrupt and wasteful practices . . . made to the [government]

official empowered to investigate such charges, obviously involves a matter of public concern.").

---

[8] Section 50 makes the same conduct a misdemeanor.

If those allegations prove untrue, the proper cause of action, if any, is one for libel.  "Consistent with the statutory – and constitutional – value of uninhibited discussion of newsworthy topics," Gruner + Jahr, 208 F.3d at 126, plaintiff cannot recover for defendant's use of his likeness in the April 22 article.  Accordingly, the privacy claims are dismissed with prejudice.

### The emotional distress claims

Plaintiff's emotional distress claims similarly fail as a matter of law.  "New York courts have consistently held that a plaintiff may not maintain a separate claim for intentional infliction of emotional distress grounded in the same facts as a libel claim."  Idema v. Wagner, 120 F. Supp. 2d 361, 370-71 (S.D.N.Y. 2000); see also Levin v. McPhee, 917 F. Supp. 230, 242 (S.D.N.Y. 1996) (reaffirming that recovery "for the emotional distress caused by publication of a libel has been held to be duplicative and more properly addressed within the context of a libel suit").  To recover for negligent infliction of emotional distress in New York, moreover, a plaintiff must plead one of two theories, both requiring that the "defendant's breach of a duty . . . unreasonably endangered [plaintiff's] physical safety."  Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996).  Plaintiff has not asserted – and cannot plausibly assert – that either of the Sahara Reporters articles placed him in peril of imminent physical harm.  Thus, the emotional distress claims are dismissed with prejudice.

### The libel claims

The gravamen of the complaint is plaintiff's claim for libel, which concerns Sahara Reporters' repetition of statements and allegations first published elsewhere.[9]  Dividing the allegedly defamatory content into two categories, as does the complaint, defendant moves to dismiss each subset on a separate ground.  To the extent that plaintiff's claim regards the

---

[9] "Under familiar principles of defamation law, [defendant] cannot escape liability for a false, defamatory statement simply because it repeated the statement of a third party."  Turner Broad., 844 F.2d at 960 (citing Restatement (Second) of Torts § 581A cmt. e (1977)).

MacArthur statements, defendant argues that plaintiff already had a full, fair and ultimately unsuccessful opportunity to litigate whether the statements' content is actionable.  To the extent that plaintiff's claim pertains to the St. Cyprian statements, defendant argues that these statements are a faithful description of the Petition's allegations and are therefore absolutely privileged under New York law.  As explained below, defendant is correct on the first count, but not the second.

### The MacArthur statements

In a detour from reporting on the Petition, the March 30 article by Sahara Reporters briefly summarizes the years-earlier Daily News article.  The April 22 article, to put a face to plaintiff's name, uses the headshot published by the Daily News.  According to plaintiff, each of these actions "republish[es] the Daily News [article] of March 30, 2008 in all its ramifications." (Compl. ¶ 10.)  Because the New York Supreme Court already ruled that the article is not defamatory, however, neither the MacArthur statements nor the article itself will sustain a renewed action for libel.

Dismissal due to issue preclusion is appropriate where "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."  Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000).  "Under New York law, issue preclusion occurs if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."  Vargas v. City of New York, 377 F.3d 200, 205-06 (2d Cir. 2004) (internal quotation marks omitted).  "Additionally, the issue that was raised previously must be decisive of the present action."  LaFleur v. Whitman, 300 F.3d 256, 271 (2d Cir. 2002) (internal quotation marks omitted).  A complaint's dismissal on

the merits provides the level of finality required for issue preclusion.  E.g., Strange v. Montefiore

Hosp. & Med. Ctr., 59 N.Y.2d 737, 738 (1983).

The New York Supreme Court's dismissal of the Daily News action precludes plaintiff's

current attempt to establish that the Daily News article was or still is libelous.  In rejecting the

previous claim, the Supreme Court ruled that the Daily News article "contains few references to

the plaintiff and none that could be considered clearly defamatory," and "that the bulk of th[e]

article, at least to the extent that it is unflattering, are various opinions of quoted individuals or

the authors."  (Balin Decl., Ex. H, at 2.)  Thus, the state court "definitely determined that the

words found in the [Daily News] article were" not actionable as libel.  Sandler v. Simoes,

609 F. Supp. 2d 293, 301 (E.D.N.Y. 2009) (granting motion to dismiss based on issue

preclusion).  For their part, the MacArthur statements have "the same 'gist' or 'sting' as the

original libel," and would have "the same effect on the mind of the reader."  Sharon v. Time,

Inc., 609 F. Supp. 1291, 1294 (S.D.N.Y. 2004).  Both assert that plaintiff was part of a "scam";

what the Daily News calls "a series of complex transactions," Sahara Reporters labels a

"roundabout journey."  Plaintiff does not contend otherwise.  Rather, he raises two technical, and

ultimately unpersuasive, arguments in an attempt to stave off dismissal.

First, plaintiff argues that federal as opposed to state law should govern the preclusive

effect afforded the final order in the Daily News action.  This argument is unsupportable.

Federal statute provides that "judicial proceedings of any court . . . shall have the same full faith

and credit in every court within the United States . . . as they have by law or usage in the courts

of such State . . . from which they are taken."  28 U.S.C. § 1738.  Accordingly, "[t]o determine

the effect of a state court judgment, federal courts, including those sitting in diversity, are

required to apply the preclusion law of the rendering state."   Conopco, 231 F.3d at 87; see also

Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373 (1996) ("Federal courts may not employ their own rules . . . in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken.").

Second, plaintiff asserts that the Daily News action lacks preclusive effect because it "is still an active case and presently pending before the Supreme Court Appellate Division." (Pl. Aff. ¶ 10.) Such a contention is disingenuous. The Daily News action is "active" only because plaintiff resurrected the action by filing a motion to replead his complaint nearly two years after it was dismissed. The appeal in question, moreover, was taken not from the earlier dismissal, but from the denial of plaintiff's recently interposed motion. Unquestionably, "the prior action was dismissed on the merits, and not merely because of technical pleading defects." Jericho Group Ltd. v. Midtown Dev., L.P., 67 A.D.3d 431, 431 (3d Dep't 2009) (affirming dismissal based on issue preclusion). In any event, "[t]he rule in New York is that the 'pendency of an appeal does not prevent the use of the challenged judgment as the basis of' collateral estoppel." Anonymous v. Dobbs Ferry Union Free Sch. Dist., 19 A.D.3d 522, 522 (2d Dep't 2005) (quoting In re Amica Mut. Ins. Co., 85 A.D.2d 727, 728 (2d Dep't 1981)); cf. Citidress II Corp. v. Hinshaw & Culbertson LLP, 59 A.D.3d 210, 211 (1st Dep't 2009) (barring relitigation of claims that "were litigated to a final conclusion in a prior proceeding culminating in an order of the Supreme Court, New York County").

*The St. Cyprian statements*

The March 30 and April 22 articles are potentially actionable for connecting plaintiff to a different alleged scam, namely the illegal diversion of public funds through fraudulent contracts for renovation of the Nigeria House. As described above, the Petition proposes to bring these instances of alleged misconduct to the attention of the relevant authorities, including Nigeria's

President and a pair of commissions created to investigate financial crimes and corruption.  The articles by Sahara Reporters, in turn, broadcast the Petition's contents to the entire Nigerian community and, indeed, to the world.

Defendant counters that New York's fair reporting privilege, codified at Section 74 of the Civil Rights Law, preempts the fourth estate's liability for such activities.  Specifically, defendant argues that "[t]he Petition is a document used to institute an official proceeding within the scope of Section 74."  (Def. Mem., dkt. #12-2, at 22.)  This argument, although colorable, would expand the statutory privilege beyond established or defensible boundaries.

Section 74 of the Civil Rights Law provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding."  N.Y. Civ. Rights Law § 74.  "The privilege set forth in [Section] 74 is absolute, and is not defeated by the plaintiff's allegations of malice or bad faith."  Pelayo v. Celle, 270 A.D.2d 469, 469 (2d Dep't 2000).  "[E]ncompassed within the privilege is the right to publish a 'fair and true' report which contains information that is 'false' as a matter of fact."  Glantz v. Cook United, Inc., 499 F. Supp. 710, 715 (E.D.N.Y. 1979).

Defendant is correct that a formal investigation into allegations of government corruption undertaken by the EFCC or ICPC would be an "official proceeding" within the meaning of Section 74.  Although the statute's goal "in part is to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest," Beary v. West Publ'g Co., 763 F.2d 66, 68 (2d Cir. 1985), "New York courts have broadly construed the meaning of an official proceeding," Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc., 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009).  Most notably, courts in a

variety of contexts have held that "a fair and accurate report of [an] investigation is privileged under Section 74." Id. (listing authority so holding); see also Turner Broad., 844 F.2d at 960 (same).  That the underlying investigation is foreign is immaterial.  See Daniel Goldreyes, Ltd. v. Van de Wetering, 217 A.D.2d 434, 435 (1st Dep't 1995) (invoking Section 74 to affirm dismissal of defamation claim arising from published reference to an "investigation and hearings by the Dutch Ministry of Justice").  To fit within the privilege's penumbra, it is sufficient that a published "report concern[] actions taken by a person officially empowered to do so."  Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York, 101 A.D.2d 175, 182 (1st Dep't 1984) (internal quotation marks omitted) ("The report is protected as long as it concerns activities which are within the prescribed duties of a public body.").

The conclusion that Section 74 shields reporting on the Petition itself, divorced from the investigation its authors request, does not follow.  Defendant asserts that "[s]uch petitions are the chief vehicles used in Nigeria to initiate government investigations into allegations of wrongdoing," and hence that they are "akin to complaints in civil actions," which clearly fall within Section 74's ambit.  (Def. Mem. 22-23.)  Plaintiff responds that Nigerian agencies do not investigate petitions that are "anonymous" or "fictitious," and he questions whether the Petition in fact "was ever submitted to any agency."  (Pl. Mem., dkt. #15, at 15.)  Even assuming that the Petition reached the relevant Nigerian authorities, however, this fact would not transform the Petition into part of an "official proceeding" under Section 74.

On the record before the Court, the Petition appears to differ from a civil complaint in two critical respects.  First, unlike a civil action, which "is commenced by filing a complaint," Fed. R. Civ. P. 3, an investigation is neither formally nor categorically launched via petition.  As defendant's exhibits illustrate, after a report of wrongdoing is submitted to the EFCC or the

16

ICPC, the recipient must then decide whether to take official action.  The EFCC, for example, will accept a petition for investigation only "if the case falls within the purview of the commission's mandate."  (Balin Decl., Ex. C, at 2.)  If not, the petition will be "sent to the appropriate agency," including perhaps the ICPC.  (Id.)  Enacted expressly to combat corruption, the ICPC will investigate only those reports that provide adequate "reasons to suspect the commission of an offence."  ICPC Act, § 27(3); see also id. § 6(a) (authorizing an ICPC investigation "where reasonable grounds exist for suspecting that" corruption has occurred).  When untrustworthy allegations appear in a petition, therefore, the ICPC is free to reject them.  When the same allegations appear in a civil complaint, conversely, a court must not only accept them but assume that they are true.

Second, Federal Rule of Civil Procedure 11 authorizes sanctions against a party or attorney who submits a civil complaint containing factual allegations lacking a reasonable prospect of evidentiary support.  See Fed. R. Civ. P. 11(b)(1), (b)(3).  There is no indication that similarly groundless petitions filed with the EFCC or ICPC are subject to sanction.[10]  Construing the statutory privilege in the suggested manner would create a recipe for libel, as specious allegations could be broadcast with impunity once sent, even anonymously, to a government agency.  Both Courts of Appeals in this state have long cautioned against expanding immunity from defamation liability in this way.  See Cianci v. New Times Publ'g Co., 639 F.2d 54, 69-70 (2d Cir. 1980) (recognizing "[t]he need for the careful limitation of" a privilege that "confers immunity even for publishing statements believed to be untrue," lest "all elements of the

---

[10] Although Section 39(2) of the EFCC Act criminalizes knowingly and intentionally making a false statement to the Commission, "'[t]he standard for triggering [sanctions] under Rule 11 is objective unreasonableness,' and is not based on the subjective beliefs of the person making the statement." Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 387 (2d Cir. 2003) (quoting Margo v. Weiss, 213 F.3d 55, 65 (2d Cir. 2000)).

media [possess] absolute immunity to espouse and concur in the most unwarranted attacks . . . made by persons known to be of scant reliability"); <u>Williams v. Williams</u>, 23 N.Y.2d 592, 599 (1969) ("[I]t was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute.").  That the Petition's true authors are unknown in this case only serves to highlight the type of mischief that defendant's concept of immunity might promote.

Each of the cases cited by defendant involves a published report of an agency investigation or adjudicatory action that is already underway.  Indeed, this Court is unaware of a single prior decision holding that the mere request for an investigation by a private individual or association (either named or anonymous) summons the generous protection afforded by Section 74.  Rather, it is the commission or agency that is officially empowered to investigate, and it is this public body whose activities implicate the privilege.  (<u>See</u> Balin Decl., Ex. C ("The [EFCC] is empowered to prevent, investigate, prosecute and penalize economic and financial crimes . . . .").).  Until such an investigation commences, if ever, no "official proceeding" has begun.  <u>Cf.</u> <u>Test Masters</u>, 603 F. Supp. 2d at 588 ("The official proceeding in this case was the [agency] <u>investigation</u>, not the press release.").

Thus, at least for the purpose of deciding whether the action may proceed, the Court concludes that the above factors materially distinguish the Petition from a civil complaint within the meaning of Section 74.  Admittedly, the result might be different if defendant had reported on an investigation by one or other Nigerian anti-fraud commission and, in the process, recounted the allegations being investigated.  Defendant asserts, however, that reports on petitions to government "are a staple of the Nigerian press."  (Def. Mem. 23).  But other

protections inhere to such accounts of potential malfeasance, including a plaintiff's burden to prove falsity, see Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, (1986), along with the task of showing that the statements were published with the level of fault required by the First Amendment to the United States Constitution, see, e.g., Gertz v. Welch, 418 U.S. 323 (1974).

In sum, this case involves news reporting on serious charges against a prominent international official and her lawyer.  Nevertheless, as a matter of statutory construction, the Court is not persuaded that the reporting in question is necessarily of the type that Section 74 was enacted to protect.  Because a private request for agency action, standing alone, is not an "official proceeding" under Section 74, the Court need not address whether the Sahara Reporters articles provide a "fair and true" account of the Petition's allegations.

*Are the St. Cyprian statements otherwise actionable as libel?*

To state a defamation claim against a media defendant under New York law, a plaintiff must adequately allege:  (1) a defamatory false statement about the plaintiff; (2) published without authorization or privilege; (3) through fault amounting to at least gross negligence on part of the defendant; (4) that either constitutes defamation per se or caused special damages. See, e.g., Dillon v. City of New York, 261 A.D.2d 34, 38 (1st. Dep't 1999); Gargiulo v. Forster & Garbus Esqs., 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009).

In isolation, the St. Cyprian statements from the March 30 article appear innocuous.  The passage recounts transactions involving St. Cyprian Properties, to which the Petition's exhibits connect plaintiff, and failed attempts by several people to reach plaintiff by telephone or email. Plaintiff does not dispute that these events occurred.  "Challenged statements are not to be read in isolation," however, "but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing."  Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 177 (2d Cir. 2000) (quoting November v. Time Inc., 13 N.Y.2d 175, 178 (1963)).  The March 30

article states that St. Cyprian Properties, which is "'Amb[assador] Ogwu's choice front,'" in fact "belongs to" plaintiff.  (Dkt. #16, at 3.)  Likewise, the April 22 article labels plaintiff "one of the beneficiaries of the suspicious contracts in which thousands of dollars are involved."  (Id. at 5.) Viewed in context, the St. Cyprian statements may plausibly be viewed to accuse plaintiff of the potentially "serious crime" of corruption.  See Liberman v. Gelstein, 80 N.Y.2d 429, 436 (1992).

Plaintiff disputes both that he owns St. Cyprian Properties and that the identified payments made to St. Cyprian Properties are unjustified.  Plaintiff's chance at recovery will hinge on whether he can prove either or both of these assertions.[11]  Because this lawsuit involves a matter of public concern, moreover, to prevail plaintiff must show at least that defendant "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  Karaduman v. Newsday, Inc., 51 N.Y.2d 531, 539 (1980) (internal quotation marks omitted).  Furthermore, by "voluntarily inject[ing] himself into a public controversy related to the subject of the litigation," Lerman v. Flynt Distrib. Co., Inc., 745 F.2d 123, 136-37 (2d Cir. 1984), plaintiff may have become a limited purpose public figure who must prove "actual malice" to recover.

These questions await another day.  See Church of Scientology Int'l v. Behar, 238 F.3d 168, 173 (2d Cir. 2001) ("[R]esolution of the falsity and actual malice inquiries typically requires discovery.").  So does an evaluation of the "possible applicability of the first amendment privilege of neutral reportage articulated by [the Second Circuit] in Edwards v. National

---

[11] Regarding the statement that St. Cyprian Properties "belongs to" plaintiff, substantial truth, as always, is a defense.  Defendant submits a copy of a deed, dated May 11, 2007, which plaintiff signed under penalty of perjury as "President" of St. Cyprian Properties.  (Hendrickson Decl., Ex. A).  Although the Court does not rely on this record in deciding the motion to dismiss, the document "serve[s] to highlight [plaintiff]'s failure to include any allegations in [his] pleading regarding the nature of [his] connection with" St. Cyprian.  Contempo Acquisition, LLC v. U.S. Dep't of HUD, 2007 WL 3254916, at *7 (S.D.N.Y. 2007) (noting fact of deed's existence and statements contained therein at Rule 12(b)(6) stage).

Audubon Society, Inc., 556 F.2d 113 (2d Cir. 1997)."  Turner Broad., 944 F.2d at 961 (citation

omitted).  For today, it is enough to hold that a private, extrajudicial allegation of corruption is

not equivalent to a formal government investigation into corruption for purposes of New York's

fair reporting statute.

## Conclusion

For the reasons given above, defendant's motion to dismiss is granted in part and denied

in part.


SO ORDERED.

Dated: Brooklyn, New York
        September 26, 2011                                    s/ Judge Raymond J. Dearie

                                                             _____
                                                             RAYMOND J. DEARIE
                                                             United States District Judge